1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9

JOSE ALEJANDRO SOTELLO,       CV F   03-6177 DLB HC

10

          Petitioner,      ORDER DENYING PETITION FOR WRIT OF
HABEAS CORPUS AND DIRECTING CLERK
OF COURT TO ENTER JUDGMENT IN

11

  v.                    FAVOR OF RESPONDENT

12

G.I. GIURBINO, WARDEN,

13

          Respondent.

14

_____/

15
16

       Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

17

pursuant to 28 U.S.C. § 2254.  Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to

18

the jurisdiction of the United States Magistrate Judge.  (Court Docs. 4, 10, 13.)

19

## PROCEDURAL BACKGROUND

20

       On August 25, 1999, Petitioner was convicted in the Kern County Superior Court for

21

robbery (Ca. Pen. Code § 212.5) and assault by means likely to produce great bodily injury (Ca.

22

Pen. Code § 245(a)(1)).  Petitioner was sentenced to 19 years in prison.

23

       Petitioner filed a timely notice of appeal with the California Court of Appeal, Fifth

24

Appellate District.  On December 27, 2001, the Court of Appeal affirmed the judgment and

25

sentence.  (Exhibit A, attached to Answer.)

26

       On February 5, 2002, Petitioner filed a petition for review with the California Supreme

27

Court, which was denied on March 27, 2002.  (Exhibits B & C, attached to Answer.)

28

       On February 20, 2001, Petitioner filed a petition for writ of habeas corpus with the

1  California Court of Appeal, Fifth Appellate District, which was denied on November 8, 2001.

2  (Exhibit D, attached to Answer.)

3      On November 19, 2001, Petitioner filed a petition for writ of habeas corpus with the

4  California Supreme Court, which was denied on March 27, 2002.  (Exhibits E & F, attached to

5  Answer.)

6      On September 2, 2003, Petitioner filed the instant federal petition for writ of habeas

7  corpus.  Respondent filed an answer on July 23, 2004.  Petitioner did not file a traverse.

8                          STATEMENT OF FACTS[1]

9      [Petitioner] and the victim of the assault and robbery, Rito Contreras, both
   are acquainted with Wendy Motta.  Wendy and her boyfriend, Alfonso Minjarez,
10  aka "Cora," had lived with Contreras and his girlfriend, Victoria Muniz, in a
   trailer on Valley Boulevard in Tehachapi during 1998.  Victoria and Wendy had
11  been good friends for about four years.  Wendy and Cora moved out of the trailer
   sometime after January 1, 1999.  At the time they moved out, Wendy and Cora
12  owed Contreras about two or three months' rent, utilities and food.
       Victoria testified that before Wendy was Cora's girlfriend, she had been
13  romantically involved with [Petitioner] "for a very long time" and they had lived
   together from time to time.  Wendy remained friends with [Petitioner] even after
14  she and Cora were living together in the trailer with Victoria and Contreras.
   Victoria testified Wendy would write to and talk about [Petitioner], and had
15  pictures of [Petitioner] in the trailer.  Victoria also testified that [Petitioner] and
   Wendy's father helped Wendy and Cora  move out of the trailer.  Contreras was
16  not at the trailer at the time of the move.
       Wendy moved to an apartment at 802 Aspen Drive located next door to
17  the apartment of Ana Carrasco and Sammy Carrasco, aka "Choco."  Choco and
   Contreras were good friends.  Contreras had lived with Choco and Ana in 1997
18  and early 1998.  About 100 yards on the other side of the street from the
   apartment building where Wendy and Carrascos lived, was 809 Aspen Drive with
19  her husband and [Petitioner].
       On February 25, 1999, Contreras's uncle came to the trailer and invited
20  Contreras to a cousin's birthday party.  Contreras agreed to go and they walked to
   the party.  Between 5:00 p.m. and 7:30 or 8:00 p.m., Contreras drank tequila
21  mixed with soda.  He had two drinks and started a third.  Contreras testified that
   he drink about a half of a pint to a pint of tequila and was not drunk.  He left the
22  party around 8:15 or 8:30 p.m.
       On his way home, Contreras decided to stop by Cora's residence and ask
23  Cora for the money Cora owed him because he needed the money for his sick
   mother.  Contreras thought Cora was living with Wendy at Gloria's residence.
24  When Contreras arrived, Gloria told him that she did not know where Cora lived.
   Contreras then stopped by Choco's and Ana's apartment, which was nearby.
25  Choco told Contreras that Cora lived next door.

26

   _____

27  [1] The following summary of facts are taken from the opinion of the California Court of Appeal, Fifth
   Appellate District appearing as Exhibit A, of the Answer to the Petition for Writ of Habeas Corpus.  The Court finds
28  the state Court of Appeal's summary is a correct and fair summary of the facts of the case.

Contreras testified that he left Choco's apartment and found Cora either leaving or entering his apartment.  An argument ensued and the men agreed to fight.  They fought in a nearby parking lot of an abandoned market.  The fight did not last long and neither man was injured.  Contreras then began to walk to his home.  Contreras passed [Petitioner] who was coming out of one of the apartments on Aspen.  As [Petitioner] passed Contreras, a female yelled in Spanish, "'It's him, the one you met.'"  The voice came from the direction of the apartments, not from where Cora was located.

Contreras continued to walk, but heard someone behind him and turned to look.  Out of the corner of his eye, Contreras saw [Petitioner] and felt a blow from an object to the back right side of his head behind his ear.  Contreras fell to the ground from the impact of the blow.  As he attempted to get up, [Petitioner] hit Contreras above his left eye and kicked him.  At least two other people joined [Petitioner] in kicking Contreras.  Contreras was unable to defend himself and rolled into a ball while the perpetrators kicked him in the head and ribs.  During the beating, Contreras heard the name "Spanky."  He also heard one of the perpetrators ask, "'I wondered [sic], would he have money, Spanky?'"  Another person said, "'We'll check.'"  Someone grabbed the pocket of Contreras's pants and, as Contreras attempted to turn to protect his wallet, the perpetrators beat him more.  Contreras's wallet, which contained about $360, was taken against his will.  Contreras heard one of the perpetrators say, just before he lost consciousness, "'It seems like he is dead,'" and another said, "'We've got to finish killing him.'"

After being unconscious for approximately three hours, Contreras was able to walk to the trailer.  Victoria called the police and at approximately 8:00 a.m. on February 26, 1999, Senior Deputy Sims went to the trailer and interviewed Victoria and Contreras about the incident.  Victoria acted as interpreter for Contreras, who speaks very little English.  Contreras told Sims that the first name of the man who robbed him was Jose or Spanky.  Contreras then went to the hospital and was treated.

On February 27, 1999, Contreras viewed the first photographic lineup prepared by the Kern County Sheriff's Office; [Petitioner's] photograph was not included.  Contreras did not identify anyone in the lineup as participating in the attack upon him.

On February 28, 1999, Senior Deputy Bryan Armendariz showed a second photographic lineup to Contreras.  This six-photograph lineup included a 1997 photograph of [Petitioner] on the left side of the top row.  Contreras did not identify [Petitioner] or anyone else in the lineup.  In preparing the lineups, the sheriff's office concentrated on individuals known as "Spanky" or "Jose."  [Petitioner's] photograph showed a teardrop tattoo below the left side of his left eye.  A third lineup of six photographs was shown to Contreras later that day.  The third lineup did not contain a photograph of [Petitioner] and Contreras did not identify anyone in the lineup.

On March 18, 1999, Armendariz showed Contreras a fourth photographic lineup.  This lineup included in the lower right hand position a booking photograph of [Petitioner] taken about a week earlier.  Contreras concentrated on the photographs in the lineup for approximately 30 seconds and then pointed to [Petitioner's] picture.  Compared to [Petitioner's] photo in the February 28th lineup, the photo in the March 18th lineup more closely resembled [Petitioner's] appearance at the time of his arrest - - [Petitioner] was thinner and had only a mustache and a tuft of hair centered under his lower lip instead of a full goatee.  The March 1999 photograph was a clearer and crisper image than the 1997 photograph and also showed [Petitioner's] teardrop tattoo below his left eye.

Later on March 18, 1999, Armendariz interviewed [Petitioner] after reading [Petitioner] his *Miranda* rights.  [Petitioner] told Armendariz his gang name was "Spanky" and he had that name since growing up in Los Angeles;

[Petitioner] also confirmed that he lived at 809 Aspen Drive.

A preliminary hearing was held on April 2, 1999; Contreras was the only witness who testified at the hearing. [Petitioner's] first jury trial on the assault and robbery charges began on June 1, 1999, and ended in a mistrial because of a deadlocked jury. [Petitioner's] second jury trial began on August 23, 1999; the same attorney represented [Petitioner] in each trial. On August 25, 1999, the jury returned a guilty verdict on both counts.

Defense

Ana Carrasco testified that on the evening of February 25, 1999, Contreras arrived at her apartment, knocked on the door and pushed the door in. Contreras was looking for Cora. Ana told Contreras that Cora lived next door and asked him to leave because he had been drinking. Contreras then knocked on Wendy and Cora's apartment door and pushed his way into the apartment without being invited. Contreras told Cora he wanted the money Cora owed him or he would kill Cora. It appeared to Wendy that Contreras was drunk because Contreras could not stand up straight, was swaying from side to side, Contreras's eyes were small and red, and his breath smelled strongly of alcohol. Wendy described Contreras's clothing as dirty as though he had gotten off work and not changed and said he had body odor.

Cora refused Contreras's demand for money, told Contreras to leave and said he did not want to talk to Contreras because Contreras was drunk. Cora had not been drinking. Cora and Contreras argued and then went outside to the parking lot. The two fought for about four minutes, but neither was hurt because the blows did not connect. Contreras was too drunk to fight.

When the fight ended Contreras walked away towards his cousin's house, saying, "'I'm going to get my cousin and kill you.'" After the fight, three White males who had been watching the fight walked off in the direction Contreras had taken, and appeared to be following him. Prior to trial, Wendy never told the police or anyone else about the White males she saw that night.

Wendy admitted that she had been [Petitioner's] girlfriend for seven years, but they had not been in a romantic relationship for a year at the time of the incident. Wendy denied knowing that [Petitioner] was living with her mother in March of 1999. Wendy also denied that she would lie to help [Petitioner]. Wendy testified that [Petitioner] did not help her and Cora move out of the trailer of Contreras and Victoria, but that it was her father and uncle who helped them move.

(Exhibit A, attached to Answer, at 2-6.)

## DISCUSSION

A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this Court. 28

U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.   Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392

1   (1983); <u>Harris v. Nelson</u>, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a

2   criminal conviction is the primary method for a petitioner to challenge that conviction.  <u>Brecht v.</u>

3   <u>Abrahamson</u>, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's

4   factual determinations must be presumed correct, and the federal court must accept all factual

5   findings made by the state court unless the petitioner can rebut "the presumption of correctness

6   by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); <u>Purkett v. Elem</u>, 514 U.S. 765, 115

7   S.Ct. 1769 (1995); <u>Thompson v. Keohane</u>, 516 U.S. 99, 116 S.Ct. 457 (1995); <u>Langford v. Day</u>,

8   110 F.3d 1380, 1388 (9th Cir. 1997).

9   C.      <u>Identification Procedure</u>

10          Petitioner contends that the pretrial photographic lineup was impermissibly suggestive

11   and irreparably tainted Contreras's subsequent in-court identifications.

12          "[C]onvictions based on eyewitness identification at trial following a pretrial

13   identification . . . will be set aside . . . only if the [pretrial] identification procedure was so

14   impermissibly suggestive as to give rise to a very substantial likelihood of irreparable

15   misidentification." <u>United States v. Montgomery</u>, 150 F.3d 983, 992 (9th Cir.1998), <u>quoting,</u>

16   <u>Simmons v. United States</u>, 390 U.S. 370, 384 (1968).  "It is the likelihood of misidentification

17   which violates a defendant's right to due process . . . ." <u>Neil v. Biggers</u>, 409 U.S. 188, 198

18   (1972).  "Suggestive confrontations are disapproved because they increase the likelihood of

19   misidentification, and unnecessarily suggestive ones are condemned for the further reason that

20   the increased change of misidentification is gratuitous."  <u>Id</u>.  An identification procedure is

21   suggestive when it "emphasize[s] the focus upon a single individual" thereby increasing the

22   likelihood of misidentification.  <u>Montgomery</u>, 150 F.3d at 992, <u>quoting,</u> <u>United States v. Bagley</u>,

23   772 F.2d 482, 493 (9th Cir.1985); <u>see e.g.</u>, <u>Stovall v. Denno</u>, 388 U.S. 293, 302 (1967) ("The

24   practice of showing suspects singly to persons for the purpose of identification, and not as part of

25   a lineup, has been widely condemned."); <u>see e.g.</u>, <u>Bagley</u>, 772 F.2d at 493 ("The repeated

26   showing of the picture of an individual, for example, reinforces the image of the photograph in

27   the mind of the viewer.").

28          In rejecting Petitioner's claim on direct appeal, the Court of Appeal stated the following:

6

We have independently examined the photocopies of each of the four photographic lineups. Each lineup consists of photographs of six Hispanic men arranged in two rows of three photographs. Before Contreras was shown each of the lineups, Victoria read to him in Spanish the photographic lineup admonition contained on the back of the lineup card. Among other things, the admonition states, the "'group of photographs may or may not contain a picture of the person who committed the crime'" and "'[d]o not tell other witnesses that you have or have not identified anyone.'"

The first and third lineups did not contain a photograph of [Petitioner]. [Petitioner's] photograph appeared on the left side of the top row, i.e. position one, in lineup two. This lineup was shown to Contreras during the afternoon of February 28, 1999. He looked at the photographs for approximately 35 seconds and then said his attacker was not in the lineup. All of the men appearing in lineup two had goatees and relatively short dark hair. [Petitioner's] picture was taken in 1997, approximately 31 years after his August 9, 1966, date of birth. The record does not reflect the ages of the other men at the time their pictures were taken, but they were born in 1967, 1973, 1975, 1976 and 1977.

In March 18, 1999, Contreras was shown lineup four, which contained [Petitioner's] photograph on the right side of the bottom row, i.e., position six. Contreras concentrated on all six photographs for about 30 seconds, and then identified [Petitioner]. All of the photographs in lineup four show men with mustaches and dark hair of varying length. It appears that one man other than [Petitioner] may have a small tuft of whiskers immediately under the center of his lower lip. The quality of the photocopy of the lineup makes it difficult to determine if another man has a very small tuft of whiskers under his lower lip or if the dark spot is a shadow on the photograph. With respect to distinguishing marks near the eyes of the men in lineup four, the man in position one had a dark, circular mark slightly below and to the right of his right eye. The man in position four had a dark, nearly circular mark to the left of the bottom of his left eye. Each of these marks was smaller than [Petitioner's] teardrop tattoo.

Lineup four used a more recent photograph of [Petitioner] than the 1997 photograph in lineup two. The photograph of [Petitioner] in lineup four had been taken about a week before the lineup was shown to Contreras. The record does not show when the other photographs were taken, but the other men were born in 1965, 1966, 1966 and 1968. Deputy Armendariz testified that the photograph of [Petitioner] in lineup four most closely resembled [Petitioner] at the time of trial. [Petitioner] was heavier and had a full goatee in the 1997 photograph; the more recent photograph was a clearer, crisper image of [Petitioner].

(Exhibit A, Opinion, at 7-8.)

In the instant petition, Petitioner takes issue with the fact that Contreras was unable to identify Petitioner in lineup two, but was able to identify Petitioner in lineup four. The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. In denying Petitioner's claim on direct appeal, the California Court of Appeal made factual findings after viewing the photographic lineups that all men in lineup two were of Hispanic origin, had goatees, and relatively short dark hair. In lineup four, all were Hispanic, all had facial hair, some of which had hair under their lower lip, and two

7

1   other men had marks under one of their eyes, as did Petitioner.  Petitioner does not point nor does
2   the Court find any evidence that indicates the photo lineups were suggestive.  Petitioner's picture
3   was not displayed in lineups one or three, and was displayed in two and four.  As stated by the
4   Court of Appeal, Petitioner's photograph in lineup four was more recent than the photo in lineup
5   two, as it had been taken only a week before the lineup was shown to Contreras, whereas the
6   photo in lineup two was taken in 1997, two years prior.  Because there is no suggestiveness in the
7   photographic lineups, Petitioner's claim fails.

8        Petitioner's contention that the identification procedures utilized was impermissibly
9   suggestive because the Deputy did not instruct Victoria Muniz, who interpreted for the Deputy to
10  not discuss the photographs with the victim, is without merit.  There is no evidence in the record
11  that Ms. Muniz discussed any information other than what was relayed by the Deputy to
12  Contreras.  A review of the record indicates that prior to being shown the lineups, Ms. Muniz
13  read to Contreras the admonishment that the individual may not be among the photographs and
14  not to tell any other witnesses whether an individual was identified.  (CT 30.)  As stated by the
15  Court of Appeal, "Victoria's role in reading the photographic lineup admonition to Contreras and
16  acting as the deputy's interpreter did not result in [Petitioner's] photograph being suggested to
17  Contreras.  Also, Victoria's statement that Contreras described [Petitioner] to her and that
18  [Petitioner] had been Wendy Motta's past boyfriend was not made in the presence of Contreras.
19  Furthermore, there is no evidence in the record that Victoria participated in Contrera's
20  identification of [Petitioner]."  (Exhibit A, Opinion, at 14.)

21       Further, Petitioner's contention that because he was the only individual in the lineup who
22  had a tattoo rendered the lineup unnecessarily suggestive, is also without merit.  A review of the
23  record indicates that Contreras did not identify Petitioner as the perpetrator because he was the
24  only person in the photo lineup with a tattoo on his face.  In fact at trial, Contreras testified that
25  on the night in question he did not notice any tattoos on Petitioner's face.  (RT 70-71.)  Further,
26  as stated by the Court of Appeal, "[w]hile [Petitioner's] small teardrop tattoo was distinctive, the
27  degree of distinction was reduced but not eliminated by the marks near the eyes of the men in
28  positions one and four of lineup four.  (Exhibit A, Opinion, at 13.)  After reviewing the

1   photographic lineup, the Court of Appeal concluded that Petitioner's photograph did not stand

2   out from the others in a way that would suggest the witness should select him. (Id. at 14.)

3         With regard to Petitioner's claim that the identification was unduly suggestive because

4   Petitioner's photograph was the only photograph appearing in both lineups, the Court of Appeal

5   stated the following:

6             In this case, 18 days passed between when Contreras was shown lineup
    two and lineup four.  All of the other photographs shown to Contreras fit the

7   general description of the attacker.  Contreras spent a relatively short time – only
    about 35 second – looking at the photographs in lineup two.  The more recent

8   photograph contained in lineup four more accurately depicted [Petitioner's]
    appearance at the time of the assault and robbery; it was also a clearer image.  In

9   view of all of the circumstances, we conclude lineup four was not made unduly
    suggestive by virtue of the fact that a different photograph of [Petitioner] had been

10  included in lineup two.

11  (Exhibit A, Opinion, at 14.)  The Court of Appeal's conclusion that the photographic lineup was

12  not unduly suggestive is not contrary to, or an unreasonable application of, clearly established

13  Supreme Court precedent and Petitioner's claim fails.

14  D.    Ineffective Assistance of Counsel

15        Petitioner contends that defense counsel was ineffective.  Petitioner argues that counsel

16  should have explored the issue of whether the photographic lineups in this case were suggestive.

17  He claims that his trial counsel should have more thoroughly questioned the law enforcement

18  officials who administered the lineups, the victim who viewed the lineups, and Victoria Muniz,

19  who also viewed the lineups.  Petitioner alleges that this harmed his case when the prosecutor

20  stated that the victim's identification of Petitioner as his assailant was not undermined or

21  impeached.  Petitioner also claims his trial counsel should have cross-examined the victim on

22  inconsistencies between his preliminary hearing testimony and trial testimony, and should have

23  objected to reference to Petitioner's gang membership.

24        The law governing ineffective assistance of counsel claims is clearly established for the

25  purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe,

26  151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective

27  assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S.

28  668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First,

1   the petitioner must show that counsel's performance was deficient, requiring a showing that

2   counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by

3   the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's

4   representation fell below an objective standard of reasonableness, and must identify counsel's

5   alleged acts or omissions that were not the result of reasonable professional judgment

6   considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

7   (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges

8   a strong presumption that counsel's conduct falls within the wide range of reasonable

9   professional assistance.  Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v.

10   Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

11         Second, the petitioner must show that counsel's errors were so egregious as to deprive

12   defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must

13   also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

14   ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356,

15   1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance

16   was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that

17   (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would

18   have been different.

19         A court need not determine whether counsel's performance was deficient before

20   examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

21   Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove

22   prejudice, any deficiency that does not result in prejudice must necessarily fail.

23         Ineffective assistance of counsel claims are analyzed under the "unreasonable

24   application" prong of Williams v. Taylor, 529 U.S. 362 (2000).  Weighall v. Middle, 215 F.3d

25   1058, 1062 (2000).

26         1.      Cross-Examination Regarding Allegedly Suggestive Lineup

27         In rejecting Petitioner's claim on direct appeal, the Court of Appeal held as follows:

28              [I]n attacking Contreras identification of [Petitioner] and Contreras' ability

10

to recall, in argument, defense counsel emphasized the alcohol Contreras had consumed earlier in the evening, the fight he had just been in with Cora, Contreras's statement "he was starting to feel it in his head," and the extent of the beating Contreras received.  Defense counsel also attacked Contreras's identification of [Petitioner] from the photographic lineups by arguing (1) lineup two was shown to Contreras three days after the attack and he was not able to pick out [Petitioner], (2) Contreras described his attacker as having a "'little goatee'" and the [Petitioner] had a goatee in lineup two, (3) [Petitioner's] picture in lineup two was the only washed out picture which would cause a viewer's attention to be drawn to it, and (4) three weeks later, when his memory would have been worse, Contreras picked [Petitioner] out of lineup four.  Defense counsel also encouraged the jury to examine the photographic lineups and, if the judge did not send the exhibits to the jury room, to request the exhibits from the bailiff.

[Petitioner] has not established the substance of the testimony defense counsel would have been elicited if he had pursued an injury into Victoria's participation in showing the photographic lineups to Contreras.  Consequently, it is a matter of speculation whether or not the evidence would have been helpful to [Petitioner].  Because it is unclear whether the witnesses' answers would have strengthened or undermined the jury's confidence in the lineup procedure, it is not possible to conclude there is a reasonable probability that, but for counsel's failure to explore Victoria's role in the lineup procedures on cross-examination, the result would have been more favorable to [Petitioner].  Therefore, [Petitioner] has failed to establish prejudice, even if we assume counsel's handling of this issue was deficient.

(Exhibit A, Opinion at 17.)

The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  Even if counsel was somehow deficient in failing to question certain witnesses regarding the suggestiveness of the identification procedure, Petitioner has failed to show prejudice.  A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  As stated by the Court of Appeal, Petitioner has not identified the substance of questioning defense counsel should have elicited, nor has Petitioner established whether the witnesses' answers would have strengthened his argument.  Accordingly, it follows that there is no reasonable probability that but for counsel's alleged errors, the result of the outcome would have been different.

2.    Cross-Examination of Victim Regarding Inconsistencies in Testimony

As previously stated, Petitioner argues that counsel was deficient in failing to cross-examine the victim on inconsistencies between his preliminary hearing testimony and trial testimony.

a.      Distance Between Petitioner and Victim

The Court of Appeal identified the relevant testimony as follows:

At the preliminary hearing, during direct examination, Contreras testified regarding the

distance between him and the [Petitioner] when they passed one another before Contreras was

attacked:

> Q.      Could you see him?
> A.      Yes. Face to face, yes.
> Q.      How far away were you from him?
> A.      Just  - - we were just passing one another.
> Q.      Within a couple of feet of each other?
> A.      About two feet.
> Q.      Was he going in a different direction than you were?
> A.      Yes.

(CT 44.)

At the trial Contreras testified as follows:

> Q.      Was [Petitioner] walking in the direction of the market where Cora was?
> A.      Yes.
> Q.      How close did you pass within one another?
> A.      About a space like this.
> Q.      What space?
> A.      About this distance almost touching one another.
> THE COURT:  He showed about four inches, four or five inches.

(RT 68-69; Exhibit A, Opinion at 18-19.)

The Court of Appeal held as follows:

> We conclude defense counsel's decision not to cross-examine Contreras
> about the difference in his estimates of how close he came to [Petitioner] when
> [Petitioner] walked past him was reasonable under an objective standard and well
> within the discretion allowed defense counsel. [Citation].  Contreras easily could
> have explained the greater distance as being his rough estimate of distance
> between their faces (his previous answer at the preliminary hearing had referenced
> a face-to-face alignment), while his trial testimony indicated how close their
> shoulders might have come to another one.  Furthermore, regardless of the
> possible explanations Contreras could have offered, defense counsel may have
> decided that an attempt to impeach Contreras on this point only would have
> emphasized that the two men were close when they passed each other and
> Contreras had the opportunity to get a good look at [Petitioner].

(Exhibit A, Opinion at 19.)

The state courts' determination of this issue was not contrary to, or an unreasonable

application of, clearly established Supreme Court precedent.  As Respondent submits, defense

1   counsel may have chosen to forgo cross-examination so as not to emphasize to the jury that

2   Petitioner and the victim were within two feet of each other.  At the preliminary hearing, the

3   victim seemed to be describing how far he and Petitioner's faces were away from each other.

4   Whereas at trial, his description on the distance seemed to focus more on how far their bodies

5   were from one another.  This slight discrepancy was likely not worth calling further attention to

6   the fact that Petitioner and the victim were quite close to each other.  Further, as the victim could

7   have easily explained the discrepancy as the distance between the two men's faces versus the

8   distance between the two men's shoulders, Petitioner fails to show prejudice.

9               b.      Description of Petitioner's Facial Hair

10          The Court of Appeal identified the relevant testimony as follows:

11          At the preliminary hearing, the following testimony was elicited from Contreras about the

12   appearance of his attacker:

13          Q.      Did he have any facial hair?
            A.      Mustache.
14          Q.      He didn't have a beard?
            A.      No.
15          Q.      And how would you describe his hair?
            A.      Hair?
16          Q.      Yes.
            A.      Short.
17          Q.      What color?
            A.      Black.
18
    (CT 53-54.)
19
            At trial, Contreras testified, again through an interpreter, as follows:
20
            Q.      Was [Petitioner's] mustache the same as it is today as it was then?
21          A.      Yes.
            Q.      Did he have a goatee, a full goatee on February 25?
22          A.      When we met be began to look at one another.  I saw his mustache and I saw that
                    he had a slight, just a little goatee.
23          Q.      Like how he is right now in court?
            A.      Yes.
24
    (RT 70.)
25
            As Respondent submits, the challenged contradiction appears to be that Petitioner had a
26
    small tuft of hair under his lower lip, or "slight . . . little goatee."  At the preliminary hearing, the
27
    victim indicated that Petitioner had a mustache, but not a beard.  At trial, the victim reconfirmed
28

that Petitioner had mustache and a little goatee.   However, as stated by the Court of Appeal, a

beard and a goatee are two different facial hairstyles.  As the victim could have easily explained

that he did not consider the small tuft of hair under the lower lip of Petitioner to be a "beard,"

which would cover the chin, cheeks and jaw of the wearer, trial counsel was reasonable in not

pursing this line of questioning.  Therefore, trial counsel reasonably refrained from useless

questioning.  In any event, Petitioner fails to show prejudice.  That is, Petitioner has failed to

demonstrate that but for counsel's error the result of the outcome would have been different.

c.   Number of Attackers

The report of the Kern County Sheriff's Department indicates that, with Victoria acting as

interpreter, Contreras told the deputy that he was attacked by Spanky and "3 other unidentified

Hispanic males."

At the preliminary hearing, defense counsel cross-examined Contreras about the number

of individuals who attacked him:

Q.    You at one point said that there was three of them that attacked you, is that
      correct?
A.    Yes.
Q.    And when you talked to the police the first time, you didn't tell them that it was
      four people?
A.    No.
Q.    So you say it was - - you said at that time it was three people, and you are saying
      today it was three people?
A.    Yes.  When they were kicking me, they were murmuring.  And I remember
      looking up, and there was three people.
Q.    Were they all men?
A.    Yes.

(CT 52.)

At trial, Contreras testified about the number of attackers as follows:

Q.    After you were on the ground what happened?
A.    I could not straighten up.  He kicked me and someone else arrived and they kicked
      me as well in the head and then I just became - - I became [sic] into a ball.
Q.    Were you able to defend yourself and fight back?
A.    No.
Q.    How many other people joined the defendant in beating you up?
A.    I would not know how to tell you, but it could have been two more.
Q.    Do you know who those individuals were?
A.    No.
Q.    Did you ever have the opportunity to see them?
A.    No.

14

1    (RT 72-73.)

2          As Respondent submits, the record demonstrates that defense counsel attempted to

3    impeach the victim at the preliminary hearing based on the number of attacks as listed in the

4    police report versus his testimony at the hearing.  The victim maintained however that there were

5    only three attackers and the police report must have been wrong.  As stated by the Court of

6    Appeal, "it is understandable how someone who has already been knocked to the ground may not

7    be able to count the number of other individuals who join in kicking him in the face and body."

8    At trial, the victim consistently testified that there were only three victims.  Any impeachment as

9    to this testimony regarding the number of attackers would not have benefitted Petitioner or

10   discredited the witness.  It was immaterial as to the number of attackers, what mattered was if the

11   victim was sure that Petitioner was among them.  Contreras unequivocal testimony was that

12   Petitioner was the individual who hit him with an unidentified object.  (RT 71.)  Based on this,

13   counsel could have reasonably concluded that cross-examination would have been futile and

14   Petitioner was not prejudiced by counsel's actions.

15          3.    Objection to Reference to Petitioner's Gang Membership Name

16          Petitioner claims that counsel should have objected to the mention of his gang

17   membership nickname.  With regard to this claim, the Court of Appeal stated the following:

18          First, Deputy Armendariz testified that [Petitioner] "told me his gang
             name was Spanky."  Second, in closing argument the deputy district attorney
19           paraphrased Deputy Armendariz's testimony by stating "We know that
             [Petitioner's] name is Spanky because we know that he told the deputy, "My gang
20           name that I grew up in L.A. with is Spanky."  Third, in rebuttal argument, the
             deputy district attorney referred to Spanky as "some kind of gang name."
21

22   (Exhibit A, Opinion at 23.)

23          In rejecting Petitioner's claim the Court of Appeal held:

24          The record for this appeal provides no explanation as to why trial counsel
             failed to object to the references to [Petitioner's] gang membership.  Our ability to
25           evaluate counsel's purported deficiency is diminished when the record fails to
             reveal the "basis for counsel's decision, and . . . that decision is not one for which
26           there could be no satisfactory explanation."  (*People v. Hart* (1999) 20 Cal.4th
             546, 589, fn. 8.)  As the Supreme Court has repeatedly stressed, "'[if] the record
27           on appeal sheds no light on why counsel acted or failed to act in the manner
             challenged[,] . . . unless counsel was asked for an explanation and failed to
28           provide one, or unless there simply could be no satisfactory explanation,' the

                                                15

1    claim on appeal must be rejected." (*People v. Wilson* (1992) 3 Cal.4th 926, 936,
2    quoting *People v. Pope* (1979) 23 Cal.3d 412, 426.)  Accordingly, on the record
     before us, we are not willing to infer there could be no satisfactory explanation for
3    the lack of objection or motion in limine — particularly where defense counsel
     handled the first trial, the trial resulted in a hung jury, and the transcript from that
4    trial is not part of the record on appeal.  Therefore, because we cannot say there
     could be no satisfactory explanation of counsel's decision, we conclude
5    [Petitioner] has failed to meet his burden showing counsel's decision was
     incompetent.
6           Nevertheless, assuming arguendo that defense counsel's representation
     was inadequate because of the failure to file a motion in limine to preclude gang
7    references, we also conclude there was no prejudice in this case.  The gang
     reference was not to current membership, but related to a different time, i.e., when
8    the [Petitioner] was growing up, and a different place, i.e., Los Angeles as
     opposed to Tehachapi.  The testimony about "Spanky" originating as a gang name
9    did not suggest the [Petitioner], who was 33 years old at the time of the trial, was
     still involved in a gang at the time of the assault and robbery.  In addition, the
10   deputy district attorney's two references to "gang name" were passing comments
     in the context of an argument that it was not a coincidence that the individual
11   Contreras chose from the photographic lineup had the nickname of Spanky, the
     same name Contreras heard during the assault and robbery.  Thus, the effect of the
12   references on the jury, if any, would be less than references to a currently active
     membership in a gang.
13          In light of the circumstances in this case, including the weight of the
     evidence against the [Petitioner], we conclude there is no reasonable probability
14   that the result would have been more favorable to [Petitioner] if a motion in
     limine had precluded all references to the gang origins of the name Spanky.

15   (Exhibit A, Opinion, at 24-25.)

16        Even assuming that counsel was ineffective for failing to object to the testimony

17   regarding his gang related nickname "Spanky," Petitioner has failed to demonstrate prejudice and

18   his claim fails on the merits.[2]  As stated by the Court of Appeal, the gang reference did not

19   indicate current gang membership, and it referred to a different place (Los Angeles), and a

20   different time (when he was growing up).  Further, as Respondent submits, the testimony did not

21   suggest current gang membership, rather it was used to determine Petitioner's identity and to

22   place him at the scene of the assault.  Therefore, the reference to the gang affiliation was minor

23   and because it was used to establish the identity of Petitioner rather than that Petitioner was

24   currently in a gang, any potential prejudice was diminished and nonexistent.  Based on the

25   circumstances surrounding the admission of the origins of the gang related nickname, it did not

26   unconstitutionally prejudice Petitioner.  The state courts' adjudication of this claim was neither

27

28        [2] A court need not determine whether counsel's performance was deficient before examining the prejudice
     suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S. at 697.

contrary to nor an unreasonable application of <u>Strickland</u>.  Accordingly, Petitioner fails to state a claim for relief.

ORDER

Based on the foregoing, it is HEREBY ORDERED that:

1.       The petition for writ of habeas corpus is DENIED; and

2.       The Clerk of Court is directed to enter judgment in favor of Respondent.

IT IS SO ORDERED.

**Dated:    July 12, 2005**                      _____/s/ Dennis L. Beck_____
3b142a                                                  UNITED STATES MAGISTRATE JUDGE

17